# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Michael T. Mason | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 2022 | **DATE** | 9/28/2004 |
| **CASE TITLE** | Lowe vs. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] As stated in the attached Memorandum Opinion and Order, plaintiff's motion for summary judgment [10-1] is granted, defendant's motion for summary judgment [11-1] is denied and this case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Opinion. This is a final judgment and order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | SEP 29 2004 | |
| | Docketing to mail notices. | | date docketed | |
| ✓ | Mail AO 450 form. | | | 13 |
| ✓ | Copy to judge/magistrate judge. | | docketing deputy initials | |
| | | | 9/28/2004 | |
| | | | date mailed notice | |
| KF | courtroom deputy's initials | | KF | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

U.S. DISTRICT COURT CLERK
2004 SEP 28 PM 2:01

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

BETTY LOWE,                              )
                                         )
            Plaintiff,                   )
                                         )
      vs.                                )     No.  04 C 2022
                                         )     Michael T. Mason,
JO ANNE B. BARNHART,                     )     Magistrate Judge
Commissioner of Social Security,         )
                                         )
            Defendant.                   )               SEP 2 9 2004

<u>**MEMORANDUM OPINION AND ORDER**</u>

      Plaintiff Betty Lowe brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration (the "SSA") denying her application for Widow's Insurance Benefits ("WIB") under Title II of the Social Security Act (the "Act"). *See* 42 U.S.C. § 402(e).  The parties have filed cross-motions for summary judgment in this case:  plaintiff asks that we reverse and remand the decision; the Commissioner asks that we affirm it.  For the following reasons, we grant the plaintiff's motion, deny the Commissioner's motion, and remand this case to the Commissioner for further proceedings consistent with this opinion.

**Procedural History**

      Plaintiff applied for WIB on March 16, 1995, alleging that she been disabled since January 1, 1993, as a result of abdominal pain and diabetes. (R. 97-99). The SSA denied her application at the initial levels of administrative review (R. 100-103, 105-07), and she requested an administrative hearing. (R. 124). On September 19, 1996, an administrative law judge ("ALJ") conducted a hearing at which plaintiff, represented by counsel, appeared and testified.  (R. 443-469).  In a decision dated November 18, 1996, the ALJ found that

plaintiff was not disabled because she retained the ability to perform her past relevant work as a secretary or interpreter for the deaf. (R. 248-54). The plaintiff requested review of this decision, which the Appeals Council granted on August 31, 1998, remanding the case to another ALJ for further proceedings. (R. 278-80).

On June 9, 1999, a second ALJ conducted another hearing at which plaintiff, represented by counsel, and plaintiff's daughter appeared and testified. (R. 27-96). In addition, Paul Glickman, M.D., and Robert Marquis, M.D., testified as medical experts (R. 27, 64-79), and Thomas Dunleavy provided vocational expert testimony. (R. 79-90). In a decision dated September 10, 1999, the ALJ found that plaintiff was disabled before April 4, 1995, but that she had the capacity to perform her past relevant work as an interpreter for the deaf after that. (R. 14-22). This became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review of the decision on January 16, 2004. (R. 2-3). *See* 20 C.F.R. §§ 404.1455; 404.1481.

**Plaintiff's Background**

Plaintiff was born on October 15, 1941, making her fifty-one years old as of the date she alleges her disability began, January 1, 1993, and fifty-seven at the time of the ALJ's decision. (R. 22-23, 98). She has a high school education and knows sign language, which she learned because her parents were deaf. (R. 17, 34). Although she is not a certified interpreter, her work experience has involved her ability to sign. (R. 80-81). From 1978 until 1990, plaintiff worked as an interpreter for the deaf at a college. (R. 110, 112). From 1990 until January of 1993, she worked at an apartment building for the deaf or disabled, where her responsibilities included collecting rent, typing, assisting tenants with

2

problems, and interpreting. (R. 36-37, 110-11). She quit that job due to abdominal pain and complications from gall bladder surgery. (R. 37-38).

**Medical Evidence**

The relevant medical evidence in this case indicates that plaintiff is an insulin-dependent diabetic, and has high blood pressure. She also suffers from chronic abdominal pain, which seemingly caused her to experience an alarming weight loss in 1993 and 1994. The medical record consists mostly of clinical notes – many of which are illegible – detailing her repeated doctor visits during this period. Unfortunately, physicians were apparently unable to determine the etiology of plaintiff's complaints, and appeared to have little success in treating them.

Plaintiff traces her problems to gallbladder surgery she underwent on January 28, 1993. (R. 143). In the weeks following the procedure, plaintiff experienced abdominal pain and loss of appetite. (R. 145-151). She was chronically nauseous and became dehydrated. (R. 152-55, 159). By May 5, 1993, plaintiff had lost a significant amount of weight, going from 125 pounds prior to surgery, to 95 pounds just four months later. (R. 159). Despite laboratory and clinical testing, the etiology for plaintiff's complaints could not be determined. (R. 154-58, 164, 168). As of August 20, 1993, plaintiff weighed just 85 pounds. (R. 173). Her abdominal pain seemed to increase after she ate. (R. 173).

On August 22, 1993, plaintiff's diabetes was uncontrolled, with her blood sugar at 303. (R. 175). It is unclear from the notes whether plaintiff's doctor had taken her off insulin or she had stopped taking it herself. (R. 175). By September 13, 1993, plaintiff's weight began to increase, up to slightly over 99 pounds. (R. 177). She continued to suffer

chronic abdominal pain, however. (R. 177). On November 9, 1993, plaintiff was placed on "regular insulin." (R. 178). Plaintiff was still complaining of abdominal pain on December 13, 1993, but her weight had increased to 101 pounds. (R. 180).

She continued to suffer severe pain into the following year. (R. 186). On January 25, 1994, a colonoscopy revealed no polyps, masses, ulcerations, or other abnormalities. (R. 189). An upper GI and small bowel study performed on March 23, 1994, revealed evidence of possible scarring in the antral and pyloric channel,[1] and delayed gastric emptying; the study was interpreted as "intrinsically negative." (R. 195). Through the month of April 1994, plaintiff's pain subsided and she continued to gain weight. (R. 196-97). Thereafter, her complaints of pain continued sporadically, but by April of 1995, she weighed 117 pounds, nearly what she weighed prior to surgery. (R. 212).

On May 8, 1996, Norton Knopf, Ph.D., performed a psychological evaluation of plaintiff at the request of the state disability agency. (R. 215-24). He noted that plaintiff's complaints were abdominal pain, diabetes, and hypertension. (R. 215). Plaintiff also claimed to be depressed and anxious, and said she had trouble with her memory. (R. 215). Dr. Knopf indicated that plaintiff was mildly anxious, but that her affect was appropriate. (R. 216). Plaintiff claimed to sometimes hear voices. (R. 216). She could remember five digits forward and three backward. (R. 216). Dr. Knopf felt plaintiff's intellect was in the low average range. (R. 216). Her abstract thinking was intact, and she could perform simple mathematics. (R. 217). Her judgment was good. (R. 218). Plaintiff

---

[1]  The dilated portion of the pyloric part of the stomach, between the body of the stomach and the pyloric canal. The pylorus is the distal aperture of the stomach, through which the stomach's contents are emptied into the duodenum. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, at 101, 1393 (28th ed. 1994).

claimed to suffer from insomnia. (R. 217). Dr. Knopf characterized plaintiff's personality as dependent and histrionic. (R. 218). His diagnosis was adjustment disorder with mixed anxiety and depressed mood, and a pain disorder with psychological factors. (R. 218). Testing revealed plaintiff's full scale IQ to be 83, which was low average range. (R. 220). Plaintiff exhibited poor spatial visualization and visual-motor capability, and a habit of working slowly. (R. 220). Dr. Knopf was of the opinion that plaintiff was capable of performing work related activities, but was significantly limited in her ability to understand, remember and carry out complex job instructions, and somewhat limited in her ability to function independently; deal with work stress; maintain attention, concentration and persistence; follow detailed instructions; and behave in an emotionally stable manner. (R.221-24).

Over the next two years, plaintiff continued to gain weight. By July of 1996, she weighed 154 pounds. (R. 388). She continued to sporadically suffer abdominal pain and nausea, and exams and tests continued to reveal no etiology. (R. 371-78, 381). In March of 1997, physicians arrived at a diagnosis of gastritis, and prescribed Prilosec. (R. 365-68). While plaintiff continued to seek treatment for abdominal pain from time to time, her weight was no longer adversely affected. Through the end of 1997, her weight ranged between 156 and 161 pounds. (R. 336, 338, 342).

Plaintiff began complaining of right shoulder pain in September of 1997. (R. 357). An MRI on October 3, 1997, revealed arthritic changes in the cervical spine, including bone spurring and possible disc protrusion. (R. 323). A tear of the rotator cuff was apparent in an MRI study of the right shoulder. (R. 321).

On October 16, 1998, Thomas Rizzo, Ph.D., conducted another psychological evaluation of plaintiff at the request of the state disability agency. (R. 293-302). Plaintiff could recall five digits forward and four backward. (R. 294). She could not do serial sevens or serial threes. (R. 294). She could recall just one word out of five after five minutes. (R. 294). Plaintiff's scores on the Minnesota Multiphasic Personality Inventory ("MMPI") suggested that she was "faking bad" responses. (R. 295). As a result, Dr. Rizzo felt those test scores were invalid. (R. 295-96). He did, however, observe that she was suffering from depression secondary to chronic pain based on his examination. (R. 296). IQ testing revealed plaintiff to have a full scale IQ of 78, which was considered in the borderline range. (R. 296). She exhibited some mild deficiencies in abstract thinking and nonverbal problem solving. (R. 296). She was somewhat limited in her fund of general and school-based knowledge, and in her ability to perform arithmetic, especially division and multiplication. (R. 296). Dr. Rizzo found plaintiff markedly limited in her ability to perform activities within a schedule and maintain attendance and punctuality. (R. 300). He found her moderately limited in the ability to sustain an ordinary routine without supervision. (R. 300). Dr. Rizzo concluded that plaintiff had low average to borderline intellectual capacity, and depression secondary to her chronic pain. (R. 302).

Dr. Karen Leone performed a physical examination of plaintiff on November 12, 1998. (R. 303-311). Plaintiff reported that she suffered from diabetes, abdominal pain, and hypertension. (R. 303-04). Regarding her diabetes, plaintiff said her toes were numb, and that she had been told her kidneys were working at half of normal efficiency. (R. 303). She was insulin dependent. (R. 304). Plaintiff stated that her abdominal pain was due to

an error during her gallbladder surgery. (R. 303). She said she suffers episodes of pain with some nausea six to seven times a month. (R. 303). Her weight was no longer affected, and Dr. Leone noted that plaintiff weighed 163 pounds. (R. 303-04). Plaintiff reported that her hypertension was controlled by medication. (R. 304). She also reported that she had an MRI of her right shoulder that revealed protruding discs in her neck. (R. 304). Physical examination was essentially unremarkable. There was a large cyst on the right shoulder and some limitation of motion there, but all other joints were normal. (R. 306). There was tenderness in her knees, however. (R. 306). Range of motion throughout the spine was normal, but there was tenderness in the neck. (R. 306). Reflexes were 2+ and equal bilaterally; sensation and motor power were normal. (R. 306). Gross and fine manipulation were normal. (R. 306). Dr. Leone opined that plaintiff could lift 50 pounds and carry 25. (R. 308). She felt plaintiff had no limitations on her ability to sit, stand, or walk. (R. 309). She also felt plaintiff could climb or balance only occasionally, and should not work at heights. (R. 310).

**Plaintiff's Testimony**

Plaintiff testified that she lived on the second floor of a two-flat with two of her daughters. (R. 34). According to plaintiff, when she had her gallbladder surgery, the surgeon damaged a nerve and this led to all of her abdominal problems. (R. 37-38). Despite taking medication for her pain, plaintiff said it did not let up and she was constantly going in to see doctors. (R. 38). Plaintiff testified that she was unable to eat and lost a great deal of weight. (R. 38). She said she was essentially bedridden for three years, until about 1997. (R. 38-39, 41). She testified that her abdominal pain was not as severe

currently. (R. 42). Plaintiff testified that she no longer took medication for her abdominal pain, and had not taken any since about 1998. (R. 46). She described her current pain as more of a pressure that was not so unbearable that she could not function. (R. 46). Plaintiff also testified that she had developed right shoulder pain and numbness down that arm to her hand. (R. 42). She said the pain in her shoulder prevented her from reaching over her head. (R. 47). Plaintiff also explained that the problem in her right shoulder adversely affected her ability to sign with her right hand. (R. 48). When she attempted to sign at a volunteer event, she was unable to do the entire event because her hand went numb. (R. 49). She stated that one of her kidneys was not functioning properly. (R. 43). She also said she got a tingling sensation from her diabetes. (R. 43-44). Her glucose level was usually about 200. (R. 43). Plaintiff testified that she took insulin and blood pressure medication, and formerly took medication for depression and anxiety years ago. (R. 49). Plaintiff testified that she became depressed when she lost her home to foreclosure. (R. 53). According to plaintiff, she had a "religious experience" in which she saw a vision of an angel that turned into a man. (R. 51-52).

Plaintiff related her daily routine. She said that she usually bathed in the morning when she got up, and would help her daughter a little with housework. (R. 54). She said she watched televison or read, and would sometimes go to the mall. (R. 54). Plaintiff indicated that she could walk for about a half-hour before her back would hurt. (R. 55). She might play with her grandchildren or take care of them for an hour or so. (R. 56-57). She said that she went to church twice a week for two or three hours. (R. 59).

## Medical Experts' Testimony

Dr. Paul Glickman reviewed plaintiff's medical records and testified as a medical expert ("ME"). (R. 64-70). The doctor noted that plaintiff had insulin dependent diabetes, with a number of episodes of elevated blood sugar, but no end organ damage. (R. 64). He said there was a single incidence of elevated creatinine[2] levels, but no evidence of renal insufficiency. (R. 64). Dr. Glickman also noted that the medical evidence demonstrated that plaintiff had cervical disc disease and a partially torn right rotator cuff. (R. 65). The doctor reviewed the history of plaintiff's abdominal complaints noting that, aside from gastritis, there was no documented diagnosis as to what the problem might be. (R. 65). He indicated that none of plaintiff's impairments, singly or in combination, met or equaled a listed impairment. (R. 66). As for plaintiff's exertional limitations, Dr. Glickman felt that her shoulder problem limited her ability to lift and perform repetitive motions with her right arm. (R. 67). He did not feel it should limit her ability to sign. (R. 67). He did, however, feel that she could probably not even lift ten pounds repetitively with her right arm and no more than twenty with her left. (R. 67). Dr. Glickman stated that there was no evidence of any impairment that would affect plaintiff's ability to stand or walk. (R. 67)

Dr. Robert Marquis, a psychiatrist, also testified as an ME after reviewing the record. (R. 70-79, 404-06). He said he had a difficult time finding that plaintiff had a severe non-exertional impairment. (R. 70). Dr. Marquis noted that, although plaintiff's consultative exams had indicated she was depressed, she demonstrated a full range of affect during the hearing. (R. 70). There was no history of psychological treatment, but weight loss

---

[2] Excreted in the urine, measurements of creatinine excretion rates are used as diagnostic indicators of kidney function. DORLAND'S, at 390.

might have been consistent with depression. (R. 70). The doctor noted that testing suggested plaintiff tended to exaggerate her psychological problems. (R. 71). In response to questioning from plaintiff's attorney, Dr. Marquis indicated that he did not disagree with the conclusions of the consultative examiners, Drs. Rizzo and Knopf. (R. 73-74). More specifically, Dr. Marquis said that he could not disagree with Dr. Rizzo's opinion that plaintiff was markedly restricted in her ability to perform activities within a schedule and maintain regular attendance as of October of 1998. (R. 75). Nor could he disagree with Dr. Knopf's opinion that in May of 1996, plaintiff had only a fair ability to deal with work stress, function independently, or maintain concentration or persistence. (R. 75). He then testified that he could not find anything in Dr. Rizzo's report that would indicate the source of a marked restriction in the ability to perform activities within a schedule and maintain regular attendance. (R. 75).

**Vocational Expert's Testimony**

Finally, Thomas Dunleavy testified as a vocational expert ("VE"). (R. 79-90). In response to questioning from the ALJ, the VE indicated that a person of plaintiff's age, education, and work experience, and who could perform medium work would be able to perform plaintiff's past work as a sign language interpreter and building manager. (R. 85). The VE also indicated that a person who was limited to simple, unskilled work could not perform those jobs. (R. 85). He also testified that an individual limited to lifting 10 pounds occasionally and five pounds frequently, and who had no restrictions on sitting, standing, walking, or manipulation could perform plaintiff's past work. (R. 86). The VE further testified that such a person could perform plaintiff's past work even if she could not lift her

10

right arm over her head.  (R. 86).   In addition, the VE stated that a person who was markedly limited in the ability to maintain regular attendance and perform activities within a schedule would not be able to perform any of plaintiff's past work.  (R. 87).  A person who had a fair ability to maintain attention and concentration, and persistence at work, according to the VE, would be able to perform plaintiff's past work.  (R. 88-89).

## The ALJ's Decision

Based on the record as a whole, the ALJ issued a partially favorable decision. Accepting the plaintiff's alleged onset date of January 1, 1993, the ALJ found that plaintiff was disabled from that date until April 4, 1995, but not disabled thereafter.  (R. 21-22).  As such, he granted plaintiff a closed period [3] of disability and WIB from January 1, 1993, through April 3, 1995.  (R. 22).  More specifically, during that period, the ALJ found that plaintiff had the residual functional capacity ("RFC") to stand or walk no more than two hours a day, sit for six to eight hours a day with frequent breaks, and lift not more than ten pounds.  (R. 21-22).  This, ths ALJ concluded, was not a capacity that would even allow

---

[3]   In cases where a plaintiff is found disabled for a closed period, medical improvement becomes an issue.  *Jones v. Shalala*,10 F.3d 522, 524 (7th Cir. 1993).  A recipient of benefits:

> ... may be determined not to be entitled to such benefits on the basis of a finding that the physical or mental impairment on the basis of which such benefits are provided has ceased, does not exist, or is not disabling only if such a finding is supported by
>
> (1) substantial evidence which demonstrates that--
>
> > (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and
> > (B) the individual is now able to engage in substantial gainful activity;

42 U.S.C. § 423(f).  Under the Commissioner's regulations, medical improvement is "any decrease in the medical severity of [the claimant's] impairments which [were] present at the time of the most recent medical decision that [the claimant] was disabled."  20 C.F.R. § 404.1594(b)(1).

plaintiff to perform a limited range of sedentary work. (R. 22). As of April 4, 1995, however, the ALJ determined that plaintiff could perform any work except for lifting over 50 pounds occasionally and 25 pounds frequently, as long as there was no overhead lifting. (R. 22). According to the ALJ, this residual functional capacity would allow plaintiff to perform her past relevant work as a sign language interpreter. (R. 22).

The ALJ determined that plaintiff did not have a severe mental impairment at any point during the relevant period, including prior to April 4, 1995. (R. 20-21). In so doing, the ALJ considered Dr. Rizzo's findings, specifically regarding plaintiff's marked limitation in ability to perform activities within a schedule and maintain regular attendance, and plaintiff's borderline intelligence. (R. 20). The ALJ rejected the marked limitation finding based on Dr. Marquis's testimony that plaintiff's MMPI score was invalid. (R. 20). He rejected the finding of borderline intelligence based on plaintiff's work history as a sign language interpreter, and on Dr. Marquis's testimony that there was no evidence of a significant nonexertional impairment. (R. 20). Accordingly, the ALJ did not consider plaintiff's mental or psychological condition to result in any limitations on her ability to work.

**Standard of Review**

The applicable standard of review of the Commissioner's decision is a familiar one: the court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997), *citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Commissioner. *Binion*, 108

F.3d at 782. Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Id.* Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Id.*

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must have "articulated" the reasons for his decision at "some minimum level." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Id.* Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595.

**Regulatory Framework**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

    1) is the plaintiff currently unemployed;

    2) does the plaintiff have a severe impairment;

    3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

    4) is the plaintiff unable to perform her past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §404.1520; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein,* 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## Analysis

The plaintiff finds several faults in the ALJ's opinion. While the plaintiff does not disagree that there was evidence that her condition medically improved as of April 4, 1995, she contends that her condition still did not allow for the performance of substantial gainful activity. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment,* at 6-7). The plaintiff's contentions focus on the ALJ's evaluation of her mental or psychological condition. More specifically, she argues that the ALJ erred in finding she did not have a severe mental impairment, and failed to determine the mental demands of her past work as an interpreter for the deaf. (*Id.,* at 7-12). Finally, the plaintiff calls into question the ALJ's determination that she has the capacity to perform work involving lifting 50 pounds occasionally and 25 pounds frequently. (*Id.,* at 12-14).

## Plaintiff's Mental Impairment

In cases where a plaintiff presents evidence that he suffers from a mental impairment, those regulations prescribe a "special technique" the ALJ must follow. 20

**14**

C.F.R. 404.1520a(a). Under the predecessor to the current regulation, which is applicable to this case, this included the requirement that the ALJ complete a "Psychiatric Review Technique Form" and append it to his decision. *Stambaugh v. Sullivan*, 929 F.2d 292, 295 (7th Cir. 1991). The ALJ did so here, and as already noted, indicated that plaintiff had an affective disorder – depression due to chronic pain – which resulted in only slight restrictions on daily living, slight difficulties in maintaining social functioning, seldom resulted in a failure to complete tasks in a timely manner, and never resulted in an episode of decompensation. (R. 25-26). Under the regulations, these levels of functioning generally indicate that a mental impairment is not severe, 20 C.F.R. § 404.1520a(d)(1), which is what the ALJ concluded in this case. A review of the evidence underlying that conclusion and the manner in which the ALJ addressed it, however, requires that this case be remanded for another evaluation of plaintiff's mental impairments.

An impairment is severe if it significantly limits the plaintiff's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c). This is not a formidable threshold. An impairment is not severe if the "medical evidence establishe[s] only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." Titles II and XVI; Medical Impairments That Are Not Severe, Social Security Ruling 85-28. In addition, in determining whether a plaintiff has a severe impairment, the ALJ must consider the combined effect of all of a plaintiff's impairments, without regard to whether any individual impairment might not be severe. 20 C.F.R. § 404.1523. In this instance, there is evidence in the record – two

psychological evaluations – that would seem to indicate that plaintiff has a severe mental impairment.

The evidence regarding plaintiff's mental condition consists of two consultative examinations; one by Dr. Knopf in May of 1996, and one by Dr. Rizzo in October of 1998. Dr. Knopf found plaintiff to be suffering from an adjustment disorder, with anxiety and depressed mood. (R. 221). His IQ testing revealed plaintiff to have a full scale IQ of 83, which was low average, and a performance IQ of 79, which placed plaintiff in just the eighth percentile. (R. 218-20). Based on his evaluation, Dr. Knopf felt plaintiff's ability to follow complex job instructions was seriously limited. (R. 222-23). He also found her abilities to deal with work stress, function independently, maintain attention and concentration, persist at tasks, and follow detailed instruction were all limited but satisfactory. (R. 222-23). Dr. Rizzo found plaintiff to be suffering from depression secondary to her chronic pain. (R. 296). He, too, conducted IQ testing, in which plaintiff scored a 78 in full scale IQ and an 80 in performance IQ. (R. 296). He essentially concurred with Dr. Knopf insofar as plaintiff's intellectual capacity was concerned: low average to borderline. (R. 302).[4] Dr. Rizzo felt plaintiff's ability to perform within a schedule and maintain attendance and punctuality was markedly limited, and that her ability to sustain a routine without special supervision was moderately limited. (R. 300). Both Drs. Knopf and Rizzo, then, found plaintiff to suffer from depression, have an

---

[4]   Placing the doctors' findings as to plaintiff's IQ and borderline intellectual functioning might be helpful. There is case law in other circuits indicating that borderline intellectual functioning should be considered a severe impairment. *Lucy v. Chater*, 113 F.3d 905, 908 (8th Cir.1997). Also, under the former Social Security Ruling 82-55, which was rescinded in the wake of the 1984 Disability Reform Act, the plaintiff's IQ test scores would not meet the definition of an impairment considered to be non-severe. Titles II and XVI: Medical Impairments That Are Not Severe, Social Security Ruling 82-55 (IQ of 80 or greater in all major areas of intellectual functioning ).

intellectual capacity in the low average to borderline range, and exhibit some marked or moderate limitations in activities related to concentration, persistence or pace. Again, these findings would seem to suggest that plaintiff's mental impairment could not be cavalierly dismissed as not severe.

The ALJ did not mention Dr. Knopf's report at all in his decision. Although the ALJ need not provide a written evaluation of each piece of evidence in the record, neither can he select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d at 333. Here, the ALJ did not even discuss a piece of evidence that tends to demonstrate that plaintiff has a severe impairment. Worse, Dr. Knopf's IQ findings support those of Dr. Rizzo, which the ALJ summarily rejected. Some discussion of Dr. Knopf's findings, then, was necessary in this case in order that the ALJ might provide a minimal articulation of his analysis.

As already noted, the ALJ did discuss Dr. Rizzo's report. In so doing, he discounted it by relying on Dr. Marquis's testimony and plaintiff's work history as a sign language interpreter. An ALJ can reject an examining medical source's opinion only for reasons supported by substantial evidence in the record. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir.2003). Under the regulations, the ALJ must generally consider whether an examining source's opinion is supported by evidence, is consistent with the medical record, and whether that source is a specialist in the relevant area. 20 C.F.R. 404.1527(d). Here, the ALJ sought to follow this regulation in a somewhat cursory fashion, by referring to the testimony of Dr. Marquis. The ALJ indicated that Dr. Marquis had testified that plaintiff's MMPI score suggested she had "faked" bad results, and that there was no evidence of any

significant nonexertional impairment. (R. 20). The ALJ also rejected Dr. Rizzo's test results indicating plaintiff was of borderline intelligence; the ALJ found that plaintiff could not have worked as a sign language interpreter if her intellect were that low. (R. 20). Instead, the ALJ determined that plaintiff did not have a severe mental impairment.

The twin pillars upon which the ALJ based his conclusion – Dr. Marquis's testimony and plaintiff's past work – fail to provide adequate support for his rejection of Dr. Rizzo's evaluation. In his testimony, Dr. Marquis did, indeed, call into question the results of the MMPI that Dr. Rizzo administered; but so did Dr. Rizzo. In fact, Dr. Rizzo indicated that the MMPI results played no part in his evaluation of plaintiff. (R. 295-96). Thus, Dr. Marquis's criticism of the MMPI results does not provide a basis for rejecting Dr. Rizzo's findings. Beyond that, Dr. Marquis's overall testimony regarding the record and plaintiff's mental impairments was, at best, equivocal. He seemed to both agree and disagree with the doctors' reports, and to the extent he might have disagreed, his reasoning was questionably supported. Review of his testimony reveals that it cannot provide substantial evidence to support the ALJ's rejection of Dr, Rizzo's findings.

First, Dr. Marquis's opinion of plaintiff's mental condition and his criticisms of the reports of Drs. Knopf and Rizzo appear to be based, in large part, upon his observations of plaintiff during the hearing on June 9, 1999. He testified that:

> [a]t this time . . . I would have a difficult time saying that I can find any non-exertional impairment that would be considered severe. . . At the present time, she's showing pretty full range of affect. I don't have history. She had a history of weight loss that would be consistent with depression, but now that's returned. And she seems to be able to interact with other people appropriately.

(R. 70). This opinion, then, would not necessarily conflict with reports of plaintiff's condition in May of 1996 or October of 1998. As the Seventh Circuit has explained:

> It is not inconsistent, particularly when considering mental impairments, that a claimant might have periods of psychiatric episode, as well as periods of remission, yet still be classified as disabled under the governing regulations.

*Sears v. Bowen*, 840 F.2d 394, 400 (7th Cir. 1987). Thus, plaintiff's failure to manifest any overt symptoms of a psychiatric disorder at that time of the hearing does not provide an adequate reason to reject the conclusions expressed in earlier psychological reports. In fact, Dr. Marquis testified that he had no reason to disagree with the conclusions of Dr. Knopf or Dr. Rizzo as to plaintiff's mental condition at the time of their exams. (R. 73-75).

Finally, we note that elsewhere in his testimony, Dr. Marquis did express actual disagreement with Dr. Rizzo's report: he said there was nothing in Dr. Rizzo's report to substantiate his finding that plaintiff was restricted in her ability to perform activities within a schedule. (R.75). In so doing, however, Dr. Marquis failed to consider plaintiff could not complete serial sevens or threes, or that her borderline IQ might impact upon her abilities. (R. 77-78). Both of these test results would seem to provide support for Dr. Rizzo's findings as to plaintiff's limitations in the area of concentration. persistence, and pace.[5]

As already noted, the ALJ rejected out of hand Dr. Rizzo's conclusion that plaintiff was limited by her low average to borderline intellect, despite the fact that it was based on IQ testing and consistent with Dr. Knopf's testing in 1996. According to the ALJ, this simply

---

[5] In terms of the effect a mental disorder might have on "concentration, persistence, or pace," the Commissioner's regulations specifically refer to "psychological test of intelligence or memory" and mental status examinations requiring "tasks such as having to subtract serial sevens or serial threes" as relevant to assessment of a plaintiff's ability to sustain focused concentration long enough to timely complete tasks in a work setting. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3).

19

could not be accurate given plaintiff's history of working as an interpreter for the deaf. It is inappropriate, however, for the ALJ to rely on plaintiff's work history to dismiss evidence of a mental impairment. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Here, there was no suggestion that Dr. Rizzo's IQ testing was invalid and, in fact, Dr. Rizzo's results were consistent with those of Dr. Knopf. Furthermore, in any circumstance, the mere fact that plaintiff might be able to work despite an impairment does not indicate the impairment is not severe. Obviously, under the five-step evaluation, it is assumed there are many severe impairments that do not preclude work; otherwise, every case would end at step two.

The record in this case contains evidence that plaintiff suffers from a severe mental impairment, be it borderline intelligence or depression or a combination of both, consisting of two psychological evaluations by examining sources. The ALJ ignored one evaluation and rejected the other. While the ALJ may reject such evidence, he cannot do so without providing adequate reasoning, and the reasoning he provides must be supported by substantial evidence. In this instance, we cannot find Dr. Marquis's equivocal testimony and the ALJ's observations regarding plaintiff's past work history provide such evidence. As such we cannot find that the ALJ's finding at step two regarding plaintiff's mental condition is supported by substantial evidence. Accordingly, the court must remand this matter to the Commissioner for further proceedings.

On remand, should the ALJ properly conclude that plaintiff does not have a severe mental impairment, the parties agree that her physical condition would not preclude her from performing her past work as an interpreter for the deaf. (*Memorandum in Support of*

*Plaintiff's Motion for Summary Judgment,* at 14; *Plaintiff's Reply Brief,* at 6). Should the ALJ instead conclude that plaintiff does have a severe mental impairment, he would be required to determine the effect that impairment would have on plaintiff's ability to perform her past work. 20 C.F.R. § 404.1520a(d)(3)(if a mental impairment is severe, but does not meet the listings, the ALJ must assess the plaintiff's RFC). Conceivably, the ALJ's analysis might take him or her beyond step four – a conclusion that plaintiff's mental condition prevents her from performing her past work – and on to step five, which would require a determination as to whether plaintiff could perform other work. As such, this would implicate the plaintiff's physical RFC, and the ALJ's finding as to that issue in this case merits brief comment.

The ALJ determined that the plaintiff had the RFC to perform all work "except for lifting in excess of 50 pounds occasionally and 25 pounds frequently so long as there was no significant overhead lifting involved." (R. 21-22). According to the ALJ's opinion, this finding was based on Dr. Glickman's testimony at the administrative hearing. (R. 19). Clearly, however, Dr. Glickman testified that plaintiff could not even lift 10 pounds with her right hand, and could not repetitively lift 20 pounds with either hand. (R. 67). Basically, Dr. Glickman felt plaintiff was limited to sedentary work. (R. 67). This is far more restrictive than the ALJ's finding. Obviously, the ALJ mischaracterized Dr. Glickman's testimony and, as such, his RFC finding is not based on substantial evidence. On remand, should the plaintiff's RFC be an issue, the ALJ will have to make a new determination.

**Conclusion**

For the foregoing reasons, the court grants summary judgment in favor of the plaintiff, Betty Lowe, denies the Commissioner's motion for summary judgment, and remands this case to the Commissioner for further proceedings consistent with this opinion.

ENTER:

MICHAEL T. MASON
United States Magistrate Judge

Dated: September 28, 2004